**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

_____

DAVID NIZNIK,

        Plaintiff,

v.                               **MEMORANDUM OF LAW & ORDER**
                                  Civil File No. 05-1169 (MJD/AJB)

CITY OF MINNEAPOLIS,
a Minnesota municipal
corporation, and CHARLES
McCREE, Minneapolis police
officer badge no. 4544,

        Defendants.

_____

Stewart R. Perry and Shawn M. Perry, Perry Perry & Perry, Counsel for Plaintiff.

James Anthony Moore, Minneapolis City Attorney, Counsel for Defendants.

_____

## I.    INTRODUCTION

     This matter is before the Court on Defendant Charles McCree's Motion for Summary Judgment [Docket No. 14]. The Court heard oral argument on January 17, 2007.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     The Accident

On June 6, 2003, between 4:00 p.m. and 5:00 p.m., Plaintiff David Niznik was driving home from work at the Compassion Center of the Living Word Christian Center in downtown Minneapolis. Niznik was driving a church-owned pickup truck in the center lane of three lanes of traffic on Third Street South, a one-way street.

Defendant Charles McCree, an off-duty Minneapolis police sergeant, was driving his SUV in the right-hand lane beside Niznik's vehicle. McCree's wife was his passenger. According to Niznik, McCree veered sharply to the left and cut off Niznik's vehicle in order to get into the center lane and avoid a construction barrier in the right lane. Niznik quickly turned his vehicle to the left, but McCree's SUV brushed the right front fender of Niznik's truck. The only damage to Niznik's truck was a scratch with paint transfer. McCree characterized the accident as "really minor."

Both vehicles pulled to the side of the street. Niznik and McCree got out of their vehicles, and McCree walked towards Niznik. Niznik said, "You cut in front of me." McCree asked Niznik for his insurance papers and Niznik asked for McCree's insurance papers. Niznik informed McCree that he did have insurance.

McCree continued to ask Niznik for his insurance information.  McCree attempted to convince Niznik that there was no need to call the police because there was minor damage.  Niznik stated that he would not give McCree information until the police arrived.

According to Niznik, at this point, McCree called Niznik over and stated, "I want to show you who you are dealing with."  McCree flashed his ID, upon which Niznik could read the word "Sergeant."  Niznik was not convinced that the man, who was acting so aggressively, was actually a police officer.  McCree continued to order Niznik to get his proof of insurance.  Niznik complied and went to the passenger door of the truck to remove the insurance cards from the glove compartment.  He found that the door was locked, so he went back to the driver-side door of the truck.  As he approached the driver's door, he realized that he had the truck keys in his pocket, so he walked back to the passenger-side of the truck.

Niznik opened the passenger door and sat on the passenger seat with his feet on the rocker panel on the outside of the truck.  He opened the glove compartment to retrieve the insurance information.  While Niznik was sitting on the passenger seat with the door open, McCree said, "I can have you arrested and thrown into jail."  Niznik was "scared for [his] life."  At 4:38 p.m., while still sitting in the truck, Niznik opened his cell phone and dialed 911.  Before Niznik could say

anything to the 911 operator, McCree grabbed him out of the truck. Although Niznik's telephone bill confirms that the 911 call was made, there is no record of the call in Minneapolis's 911 records.

McCree grabbed Niznik's right arm in the bicep area hard enough to cause bruising, attempted to force Niznik's arm behind his back, laid Niznik out on the seat, and tried to turn Niznik sideways to get his right arm behind his back. McCree ordered Niznik to get his arm behind his back. Niznik said, "Okay, okay." McCree broke contact with Niznik and said, "Get out of here," meaning to get out of the truck. Niznik complied and as he was getting out of the truck said, "Oh, no. I messed my pants." Niznik noticed that he was still defecating in his pants as he was getting out of the truck.

McCree barked, "Get on, get out of here and get on your knees." As Niznik attempted to get onto his knees, McCree forced him to the ground and abruptly slammed Niznik's face into the pavement. McCree put his knee on the base of Niznik's neck as he told him to put his hands behind his back. McCree then stood with his foot on Niznik's spine in his upper back.

At 4:40 p.m., two minutes after Niznik's call, McCree used his own cell phone to call 911 and ask for a squad car. During the call, McCree did not mention fear of Niznik having a weapon or a concern that Niznik would flee. McCree stated, "A guy hit me and refused to show me his insurance or license."

When the dispatcher asked why McCree was out of breath, he responded that he "had to arrest him a little bit." The dispatcher asked, "Now everything is under control?" McCree responded, "Yep, everything is under control."

According to Niznik, while McCree was dialing 911, he stated, "I will let you up if you be quiet." Niznik responded, "I didn't do anything." McCree replied, "Well, be that way, if you are going to be that way stay down on the ground then."

### 2. Witness Accounts

#### a. Maxine Bass

Witness Maxine Bass called 911 from her cell phone at 4:41 p.m. Bass was standing on the corner of Third Avenue and Third Street and saw McCree and Niznik talking to each other. She saw Niznik apparently attempt to retrieve insurance information, and then saw McCree "jerk[]" Niznik out of his truck. McCree "threw him to the ground and started pounding on him." She then saw McCree standing with his foot on Niznik's neck. Bass told the 911 operator that "there is someone getting the crap beat out of them."

#### b. John Hogan

Witness John Hogan called 911 from his cell phone at 4:44 p.m. He stated that a man "was standing on top of someone."

Although 911 has a recording and transcript of McCree's 911 call, it has no recordings of Niznik's, Bass's, or Hogan's calls, allegedly "because of technical

problems with the Minneapolis 911 recording system that day." However, the 911 Log confirms Bass's and Hogan's calls, and Niznik's Sprint bill confirms his telephone call.

### 3.     Arrest and Criminal Charges

Two Minneapolis police officers responded to McCree's call and arrived at the scene. When the squad car arrived, McCree borrowed handcuffs from the other officers and put them on Niznik. McCree bruised Niznik's wrists while tightly handcuffing him. One of the police officers told Niznik that they could arrest him and throw him in jail and that "[n]obody messes with Sarge." Although the two officers were present and McCree was a participant in the accident, McCree wrote up the tickets himself charging Niznik with disorderly conduct and reckless driving. Former Minneapolis Police Chief William McManus admitted that this conflict of interest was a violation of department policy.

Niznik was eventually charged with disorderly conduct, reckless driving, and a safety belt violation. The Minneapolis City Attorney agreed to suspend prosecution and dismiss the charges if Niznik did not commit similar offenses within one year and paid costs.

### 4.     Injuries

Niznik asserts that McCree's actions caused him to suffer "pain and shock." His whole body "was numb from the shock." He also claims that he sustained an

exacerbation of a preexisting neck injury, facial redness, bruises on his right bicep, and bruises from the handcuffs. Niznik did not seek medical attention for his neck injury immediately after the incident, but testified that his doctors stated that there is a "very strong possibility" that the ongoing problems he is currently experiencing with his neck might be related to the incident with McCree.

### B.     Procedural Background

In May 2005, Niznik commenced a lawsuit against the City of Minneapolis ("City") and McCree in Minnesota state court. On May 23, 2005, Niznik served an Amended Complaint. On June 15, 2005, Defendants removed the case to this Court.

On June 27, 2006, Magistrate Judge Boylan granted Niznik's Motion to Amend the Complaint. The Second Amended Complaint alleges Count One: Civil Rights Violations by Defendant McCree for false arrest and use of excessive and unreasonable force. It contains no charges against the City. However, Niznik has not filed his Second Amended Complaint, other than as an exhibit attached to an affidavit in support of his motion to amend. In order to clarify the docket, the Court directs Niznik to file his Second Amended Complaint.

McCree now moves for summary judgment.

## III.   DISCUSSION

### A.     Summary Judgment Standard

7

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law.  But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment."  Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994) (citations omitted).

### B.   Qualified Immunity Standard

When bringing a section 1983 claim a plaintiff must establish (1) that he was deprived of a right secured by the Constitution or laws of the United States and (2) that the deprivation was committed under color of state law.  Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  Graham v. Connor, 490 U.S. 386, 393-94 (1989) (citation

omitted). Niznik asserts that McCree violated his constitutional rights through use of excessive force during his arrest and through false arrest.

McCree argues that qualified immunity shields him from liability for both claims. "The purpose of qualified immunity is to allow public officers to carry out their duties as they believe are correct and consistent with good public policy, rather than acting out of fear for their own personal financial well being." Sparr v. Ward, 306 F.3d 589, 593 (8th Cir. 2002) (citation omitted). "Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." Henderson v. Munn, 439 F.3d 497, 501 (8th Cir. 2006) (citations omitted).

The Court performs a two-step inquiry to determine whether McCree is entitled to qualified immunity:

> (1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional or statutory right; and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted.

Henderson, 439 F.3d at 501-02 (citations omitted).

### C. Excessive Force Claim

#### 1. Standard for Excessive Force

Generally, the Fourth Amendment protection against unreasonable seizures

of the person provides a clearly established right to be free from excessive force during arrest. <u>Guite v. Wright</u>, 147 F.3d 747, 750 (8th Cir. 1998). When determining whether a law enforcement officer used excessive force in the course of an arrest, "[t]he question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Winters v. Adams</u>, 254 F.3d 758, 765 (8th Cir. 2001) (citation omitted). "Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct." <u>Henderson</u>, 439 F.3d at 502 (citation omitted).

### 2.    Whether a Fourth Amendment Violation Occurred

#### a.    Whether McCree's Actions Were Reasonable

McCree argues that no Fourth Amendment violation occurred. He asserts that he tried to diffuse the situation after the accident by exchanging insurance information and that Niznik acted suspiciously and erratically by walking back and forth between the driver-side door and the passenger-side door of his truck without telling McCree that he was searching for insurance information. McCree claims he made a split-second decision to pull Niznik out of his vehicle to protect himself and others. McCree continues that he offered to let Niznik up off of the ground if he would stay calm but Niznik gave a "smart response," giving McCree

reason to think Niznik continued to be a threat.

McCree asserts that this case is similar to Lawson v. Hulm, in which the plaintiff approached a trooper and his dog with a knife to see the dog, two other troopers ordered the plaintiff to drop his knife, which he did, and then the troopers grabbed and handcuffed the plaintiff without warning although he did not resist them.  223 F.3d 831, 833 (8th Cir. 2000).  The Eighth Circuit held that the troopers were entitled to qualified immunity because they could have reasonably believed that the plaintiff was concealing a weapon capable of harming the first trooper and that the first trooper's "life was in imminent danger." Id. at 834.  Based on that reasonable belief, it was not unreasonable for the defendant troopers to disarm and restrain the plaintiff.  Id.  However, Lawson is not relevant to this case because the plaintiff in Lawson admitted that the officers in question "had probable cause to believe that [their fellow officer] was in danger under the circumstances." Id. at 833.  The plaintiff in Lawson also admitted holding a knife. Id.  Niznik makes no similar admission here, and it is undisputed that he was unarmed.  Also, according to Niznik, McCree initiated the situation by hitting Niznik's car and being belligerent, whereas the plaintiff in Lawson admittedly initiated the confrontation while armed with a knife.

Viewing the facts in the light most favorable to Niznik, Niznik was not stopped by McCree for any crime; rather, McCree hit Niznik's truck after McCree

made an unsafe lane change. Niznik followed McCree's instructions to obtain proof of insurance. He took no threatening action toward McCree or anyone else. He sat in his truck, on the passenger side, with his feet on the rocker panel getting his insurance papers and dialed 911 when McCree verbally threatened him. These actions were consistent with McCree's instructions to obtain insurance and inconsistent with an attempt to flee, yet McCree terrorized Niznik so much that he defecated in his pants. Then, Niznik complied when McCree took him out of his truck and told him to get on his knees. McCree slammed his face into the concrete and stepped on his upper back for no justifiable reason. Niznik's account is corroborated by two independent witnesses.

Niznik was not verbally abusive and sarcastic; rather, he merely asked for McCree's insurance before knowing that McCree was a police officer. This was a natural response after McCree had made an unsafe lane change and hit Niznik's truck. In McCree's own police report, he admits that Niznik requested McCree's insurance and stated that he would produce his own insurance once the police had arrived. These statements are non-threatening and do not justify the alleged use of force. When the facts are viewed in the light most favorable to Niznik, there was a violation of Niznik's Fourth Amendment right to be free from excessive force.

      **b.**      **Extent of Niznik's Injuries**

McCree claims that Niznik's injuries are too minor to support a claim for excessive force. He asserts that Niznik only claims a non-permanent aggravation of a preexisting neck or shoulder injury, minor facial abrasions, a bruise on his arm, and marks on his wrists from handcuffs.

McCree asserts that this case is similar to Crumley v. City of St. Paul, 324 F.3d 1003 (8th Cir. 2003). In Crumley, the Eighth Circuit held "that for the application of handcuffs to amount to excessive force there must be something beyond allegations of minor injuries." Id. at 1008 (citation omitted)  Crumley is not controlling in this case because in Crumley the plaintiff admitted taking action that could be construed as resisting arrest and the plaintiff suffered minor injuries as a result of **handcuffing only**. Id. at 1007-08. The Eighth Circuit did not hold that serious injuries are required to support all excessive force claims; rather it narrowly held that injuries from the application of handcuffs must be more than minor injuries in order to support an excessive force claim.

In fact, the Eighth Circuit "has specifically rejected the 'significant injury' requirement" for excessive force claims. Lambert v. City of Dumas, 187 F.3d 931, 936 (8th Cir. 1999). The court explained, "Assuming without deciding that [a plaintiff bringing an excessive force claim against police officers] must have suffered some minimum level of injury to proceed . . ., we conclude that the necessary level of injury is actual injury." Id. (citation omitted). The Eighth

13

Circuit has specifically held that following examples constitute "actual injury:" 1) "bruises and a facial laceration," 2) "bruised knees and elevated blood pressure," 3) "posttraumatic stress disorder," or 4) a "single small cut of the lateral right eyelid and small scrapes of the right posterior knee and upper calf." Id. (citations omitted). See also Mayard v. Hopwood, 105 F.3d 1226, 1228 (8th Cir. 1997) (holding that "a police officer's slapping in the face and punching in the chest a handcuffed and hobbled prisoner while using a racial epithet are actions that result in a cognizable constitutional injury").

Niznik alleges more than the painful application of handcuffs: he also alleges that McCree brutally forced his arm behind his back, slammed his face onto the pavement, and forcibly kept him face-down on the ground with his foot. Because Niznik has presented evidence of far more force than routine handcuffing, the Court concludes that he has sufficient evidence of actual injury to survive summary judgment.

### 2. Whether Niznik's Right Was Clearly Established

"[T]he right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." Henderson v. Munn, 439 F.3d 497, 503 (8th Cir. 2006) (citations omitted). Thus, the Court "must determine if genuine issues of material fact exist as to whether a reasonable official would understand his conduct

14

violated that right in the situation he confronted." Id.  McCree "must demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant possessed at the time of his actions." Id. (citation omitted).

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Hope v. Pelzer, 536 U.S. 730, 739 (2002) (citations omitted).

McCree notes that Niznik admits that he moved back and forth between the passenger and driver doors of his truck.  McCree claims that this behavior caused him concern.  When Niznik got into his truck, McCree claims that he did not know what Niznik was doing and was concerned that Niznik might flee or retrieve something.

McCree analogizes this case to Saucier v. Katz, in which the Supreme Court held that qualified immunity applied to a military police officer who dragged away a protester who attempted to unfurl a banner near the Vice President and gave the protester a shove into the detention van.  533 U.S. 194, 208-09 (2001).  There, the Supreme Court noted that the officer "did not know the full extent of the threat respondent posed or how many other persons there might be who, in concert with respondent, posed a threat to the security of the Vice President." Id.

at 208.  <u>Saucier</u> is distinguishable from this case because 1) the officer in <u>Saucier</u> was attempting to protect the Vice President from a protester, rather than interacting with the compliant victim of an accident allegedly caused by the police officer; 2) there were other protesters present creating a crowd situation, whereas Niznik was the lone passenger in his truck; and 3) Niznik alleges more force than being dragged away and shoved into a van.

Niznik has presented evidence demonstrating that he was complying with McCree's orders when McCree twisted his arm, threw him onto the seat, slammed his head into the concrete, and stood on his neck.  Under clearly established law, such force was excessive when applied to a plaintiff who had committed no crime, was not resisting the officer, and posed no visible threat.  <u>See, e.g.</u>, <u>Goff v. Bise</u>, 173 F.3d 1068, 1074 (8th Cir. 1999) (upholding denial of qualified immunity when plaintiff was handcuffed, thrown to the ground and pinned, and choked, when he "committed no crime, posed a threat to no one, and resisted only after when his personal adversary was permitted to inflict pain upon him while illegally arresting him").  If the jury credits Niznik's testimony over McCree's, then McCree is not entitled to qualified immunity.  McCree's behavior violated clearly established law.  Thus, summary judgment is denied.

### D.  False Arrest Claim

Niznik's "claim of unlawful arrest turns on whether [he] presented sufficient

facts from which a reasonable juror could find that [McCree] lacked probable cause to arrest him. If probable cause was indeed present, it is not necessary to consider an immunity defense." Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1079 (8th Cir. 1990) (citations omitted).

> Probable cause exists if the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense at the time of the arrest. [T]he probability, and not a prima facie showing, of criminal activity is the standard of probable cause. Therefore, law enforcement officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so-provided that the mistake is objectively reasonable. Stated otherwise, [t]he issue for immunity purposes is not probable cause in fact but arguable probable cause.

Smithson v. Aldrich, 235 F.3d 1058, 1062 (8th Cir. 2000) (citations omitted).

McCree asserts that he had at least arguable probable cause for citing Niznik for reckless driving and disorderly conduct because Niznik's truck had collided with McCree's vehicle and Niznik's behavior appeared threatening. At this stage in the proceedings, however, the Court must view the facts in the light most favorable to Niznik. Niznik testified that McCree, not Niznik, committed the traffic violation by making an unsafe lane change and striking Niznik's vehicle. Also, Niznik's testimony, corroborated by witnesses, demonstrates that he did not engage in threatening behavior or cause a threat to McCree or bystanders. Rather he was compliant with McCree's instructions once McCree identified himself as a police officer.

17

Viewing the facts in the light most favorable to Niznik, McCree caused the car accident that precipitated this event, and Niznik was compliant; thus, McCree could not have possessed the reasonable belief that probable cause existed to cite Niznik for reckless driving or disorderly conduct.  Summary judgment is denied.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Defendant Charles McCree's Motion for Summary Judgment [Docket No. 14] is **DENIED**.

2. Plaintiff  David Niznik is directed to immediately file his Second Amended Complaint.

Dated: January 28, 2007                                       s / Michael J. Davis
                                                                               Judge Michael J. Davis
                                                                               United States District Court